**Myrtle Green BURTON, Individually and in her Capacity as Representative of James Earl Green, Deceased, et al., Plaintiffs-Appellants,**

v.

**William L. WALLER, Individually and as Governor of the State of Mississippi, et al., Defendants-Appellees.**

No. 72–2311.

United States Court of Appeals,
Fifth Circuit.

Oct. 18, 1974.

Ralph L. McAfee, Robert F. Mullen, Andrew P. Tashman, Wayne A. Cross, New York City, for Burton and others.

George Peach Taylor, Lawyers' Committee for Civil Rights Under Law, Constance Iona Slaughter, James M. Abram, Jackson, Miss., Dale Broeder, Lake Oswego, Or., James Reif, Jackson, Miss., for plaintiffs-appellants.

Robert G. Nichols, Jr., Rufus Creekmore, John E. Stone, Jackson, Miss., for Davis and others.

William A. Allain, Asst. Atty. Gen., A. F. Summer, Atty. Gen. of Miss., Charles A. Marx, Jackson, Miss., for Highway Patrol, Williams and others.

Robert E. Hauberg, U. S. Atty., Joseph E. Brown, Jr., Asst. U. S. Atty., Jackson, Miss. for F.B.I.

Roger Googe, Jr., Sp. Asst. Atty. Gen., Jackson, Miss., for defendants-appellees.

Before JONES, GODBOLD and INGRAHAM, Circuit Judges.

GODBOLD, Circuit Judge:

This is a civil suit seeking recovery of damages for the deaths of two black persons and injuries to three others from gunshot wounds suffered on the campus on Jackson State College in Jackson, Mississippi, on the night of May 15, 1970. These five persons, plus at least nine other blacks who were wounded but are not parties to the suit, were struck by gunfire laid down by a detachment of officers who were on the campus as a result of student disorders.

The law enforcement detachment from which the gunfire came consisted of 69 persons, from the Mississippi Highway Safety Patrol (MHP) and the

Jackson Police Department (JPD). Suit was brought against all members of the detachment, the State of Mississippi, the City of Jackson, and numerous other persons not present at the scene but having official connections with the state, the city, MHP and JPD.[1] At trial a number of defendants who were members of the detachment, all of them non-supervisory personnel, testified that they did not fire their weapons, and prior to submission of the case to the jury they were dropped as defendants for want of proof. The composition of the detachment was as follows:

—Forty-three persons from the MHP. Of these, 38 (35 patrolmen and three supervisory officers) admitted firing their weapons and remained in the case as defendants. Also remaining as a defendant was MHP Inspector Lloyd Jones, who was the highest ranking MHP officer present but who did not fire. The remaining patrolmen testified they did not fire and were dropped as defendants.

—Twenty-six persons from the JPD. Five admitted firing and remained as defendants. Also remaining as a defendant was JPD Lieutenant Warren Magee, who was present and in command of the entire detachment but did not fire. Other JPD officers present testified they did not fire and were dropped as defendants.

Also remaining in the case as submitted to the jury were the State of Mississippi, the City of Jackson, and Commissioner Crisler.[2]

In the three-week jury trial the plaintiffs offered, in addition to their own testimony, that of numerous Jackson State students, several FBI representatives, officers in charge of training for the JPD, the MHP and the Mississippi National Guard, and an outside expert on police procedures for crowd control. Plaintiffs called as adverse witnesses all individual officers and supervisory officers present at the scene and Commissioner Crisler. Almost all of the testimony regarding the conduct of each individual officer at the time of the shooting, and all of the testimony as to who did and who did not join in the firing, came from each officer himself as an adverse witness. Thus all non-supervisory officers who remained in the case as defendants did so on the basis of each's admission from the witness stand that he fired. All officers who denied firing were dropped as defendants on the basis of their own testimony (except non-firing supervisory officers who were claimed to have failed to discharge supervisory duties).

At the close of the evidence plaintiffs moved for directed verdicts on the issue of liability, and the trial judge reserved decision. The jury returned a general verdict for all defendants. The District Judge then denied the directed verdict motions and motions for judgment n/o/v. In his accompanying bench opinion he stated that he considered the city and state to be immune from suit.

We have untangled as painstakingly as we are able the complex web of legal and factual issues. Having done so, we find no reversible error in the trial judge's rulings of law or in his submis-

1. The suit was brought under 42 U.S.C. § 1983, the Mississippi Wrongful Death Act, Miss.Code Ann. § 1453 (Now Miss.Code 1972 Ann. § 11–7–13), and the Mississippi common law. Federal jurisdiction is conferred by the § 1983 claim. The federal court has jurisdiction over the state claim because it and the federal claim arise from the same nucleus of operative facts. Anderson v. Nosser, 438 F.2d 183, 188–189 (CA 5, 1971), modified on rehearing on other grounds, 456 F.2d 835 (CA 5, 1972) (en banc).

2. Among those defendants not present at the scene but having some connection with the city or state at the time of the shooting, and dropped from the case by plaintiffs, were John Bell Williams, Governor of Mississippi; Russell Davis, Mayor of Jackson; James D. Gardner, Chief of the MHP; M. B. Pierce, Assistant Chief of the JPD; Woods Stringer, Chief Inspector of the Northern District of MHP.

sion of the isues to the jury, and we affirm.

Our inquiry into the facts and the law will follow this pattern:

A. The facts.

B. The effect of the gunfire.

C. Immunity from suit of the state and the city.

D. Sources of liability.

E. Liability of officers who fired.

F. Liability of individuals on other grounds.

G. Jury charges—and some loose ends.

H. Conclusion.

### A. THE FACTS.

Because plaintiffs claim that the court erred in denying their motions for directed verdicts and judgments n/o/v, the facts must be set out in detail, with all reasonable inferences in favor of defendants.

### 1. The physical layout.

Jackson State College is a virtually all black four-year college with approximately 4,300 students, located in Jackson, Mississippi. The campus is bisected along its east-west line by Lynch Street, a major thoroughfare. Alexander Hall, the women's dormitory at which the shootings in issue occurred, is on the north side of Lynch Street. Most of it is pictured in the photograph PX 45.

Almost directly across from it and on the south side of Lynch Street is Roberts Dining Hall.

Alexander Hall houses between 900 and 1,000 female students. The front wings extend toward Lynch Street, and the center section, which consists generally of a first floor lobby area and dormitory rooms on the upper four floors, runs parallel to Lynch Street. The front wings, the sidewalk and the center section form a grassy courtyard. A four-foot chain link fence separates the

sidewalk on Lynch Street from the courtyard.

PX 133 shows the west wing of Alexander Hall as seen from Lynch Street.

The wing is 48'2" high. The central column, enclosing a stairway, is made up of five metal panels, each coinciding with a floor of the dormitory. Each panel contains a window composed of two large panes and located at the landing between floors. There are two glass doors at the ground level of the stairwell.

2. The night of May 13.

On the evening of May 13, 1970, students of Jackson State began throwing bricks, rocks, and other objects at cars passing through the campus on Lynch Street. Windows and headlights were broken on some cars, and a traffic light was broken out with rocks. In response Jackson police barricaded Lynch Street at both ends of the campus. Students set fire to two garbage carts used to haul trash from campus facilities, and they also made an attempt to burn the Army ROTC building. A contingent from the JPD assisted by members of the MHP—62 men and seven supervisory officers altogether—entered the campus to secure the ROTC building. The entire detachment was under the command of Lt. Magee of the JPD, and the highest ranking MHP patrolman present was Inspector Jones.

This group was subjected to some rock throwing and verbal abuse, and at least one patrolman was hit by a rock. Several of the officers heard occasional reports from small caliber weapons. The police found in automobiles and on persons in the area at least one high caliber military rifle and several small

caliber sidearms. None of the officers felt that he had been fired upon, however, and none discharged a weapon. Ultimately they were successful in providing security for the ROTC building, and as the evening wore on the two trash cart fires died down and the crowds dispersed.

In a printed handbill distributed to the student body on the morning of May 14, the president of Jackson State described the events of the preceding night thusly:

> On Yesterday evening, May 13, we had another what has become [sic] the annual riots at Jackson State College. This latest riot was perpetuated by a faceless, mindless mob of students and non-students bent on doing violence and destruction to the college and doing bodily harm to our own counselling personnel as well as to unsuspecting passersby. Considerable damage was done to the college property, mainly in the form of glass breakage. Two trailers used to haul garbage from dormitories and the dining hall were burned. Also a very determined attempt was made to incinerate Barracks 1–A. . . .

### 3. The official preparations.

The Mayor of Jackson had been oriented by the college president and, fearing the inadequacy of the JPD, had on May 13 requested assistance from the Governor of Mississippi. The Governor issued a proclamation invoking full police power on behalf of the Department of Public Safety, see Miss.Code Ann. § 8082 (now Miss.Code 1972 Ann. § 45–3–21), and issued executive orders mobilizing units of the Mississippi National Guard and directing the MHP to provide needed assistance to the JPD upon request by the city. On the morning of May 14 General Walter Johnson of the Mississippi National Guard conducted a meeting at the National Guard Armory in Jackson to coordinate plans for coping with the disorders at the college. Lt. Magee represented the JPD at this meeting; the MHP did not send a representative. The plan ultimately formulated called for 1,000 guardsmen equipped with armored personnel carriers and tear gas to stand ready to be committed at Lt. Magee's request. Selected guardsmen had orders to carry high caliber rifles with sniper scopes, but most were to carry unloaded shotguns, and on command they were to load first with four rounds of number 9 birdshot so as to minimize injuries.

### 4. The night of May 14.

During the day of May 14 property damaged the preceding night was repaired, and classes and final examinations proceeded as usual. That night, however, the difficulties resumed. Lt. Magee testified that "People were being rocked as they came through this area in their vehicles; . . . people were being injured as they passed through, bricks and things coming through their cars. We had a large group of people in this area that were becoming unruly." As on the preceding night, the officers barricaded Lynch Street. Shortly thereafter a privately owned dump truck was set afire by students on Lynch Street in front of Stewart Hall, a men's dormitory on the western edge of the campus. Responding to this incident, the same force of policemen and patrolmen that had been there the preceding night entered the campus, again under the command of Lt. Magee of the JPD and with Inspector Jones as the highest ranking MHP patrolman present. The force deployed between the burning truck and a crowd of 200 to 300 persons. Lt. Magee used a bullhorn to persuade the crowd to move away from the truck, and a fire truck was brought in to extinguish the fire. Many objects were thrown at the officers, including bottles and pieces of concrete, and they were called a variety of obscenities.

Some of the officers heard small caliber weapons being fired, and Inspector Jones testified that the fire truck was fired at. A few MHP patrolmen led by Inspector Jones entered an alley beside Stewart Hall, a bottle was hurled at

them, and one or more of them responded with gunfire, inflicting no personal injuries but some property damage to the side of Stewart Hall. At about this time Lt. Magee requested aid from the National Guard, which promptly sent a force of guardsmen to assume positions around the perimeter of campus.

The policemen and patrolmen regrouped, and from Stewart Hall they began a march eastward along Lynch Street to provide security for the fire truck which had moved to a new location. With them was "Thompson's Tank," an armored bus or truck of the JPD. Students followed along the sidewalks. Numerous missiles were thrown at the officers, and many officers were struck. The obscenities continued. By the time the officers reached a point in front of the West Wing of Alexander Hall the crowd had swelled to 300 to 400 students and was unruly, so Lt. Magee halted his contingent. There was widely varying testimony from the officers as to how much time elapsed between the contingent's halting and the outbreak of firing. Lt. Magee described his own actions after the halt in this manner. He used his bullhorn to order the students to disperse, and the crowd began complying. They began to file off the street and into the courtyard in front of Alexander Hall, but, because they had to pass through a narrow gate in the fence, the process of dispersion went slowly. While the officers waited for the crowd to enter the courtyard more objects were thrown at them, and Lt. Magee was hit by one of the missiles. Nevertheless, Lt. Magee did not feel that tear gas was necessary to assist in dispersing the crowd.

Q. While you were in front of the crowd prior to the time the shooting started, did you give any order to use the tear gas?

A. [Lt. Magee]: I didn't think it was necessary at that time, the people were complying with my request.

Q. They were withdrawing from the street area and dispersing as you were ordering them to do?

A. Yes, sir.

The members of the detachment were equipped with a wide assortment of weapons. Most of the patrolmen, 35, carried 12 gauge pump action riot shotguns loaded with 00 buckshot. The JPD officers also had 12 gauge shotguns, but they used number 1 buckshot instead. Each shotgun shell contained nine pellets, and each pellet of either 00 or number 1 buckshot was approximately the diameter of a .30 caliber bullet. Five patrolmen carried their personal military carbines, two carried 9 mm. submachine guns, and one carried a .308 rifle. Two sergeants of the Police Department assigned specially to watch for snipers carried AR-15 rifles. The MHP patrolmen carried their weapons loaded. All but five of the policemen carried their weapons without a round in the chamber. Inside "Thompson's Tank" were 10 policemen equipped with tear gas launchers and tear gas. The remaining 16 policemen were clustered southeast of the tank, and the 43 MHP patrolmen stood generally to its west.

Shortly after the contingent had halted and when the crowd in the courtyard numbered about 400 students, a sound resembling the report of a small caliber pistol was heard. There is sufficient evidence, in the form of testimony by many officers and by newsmen, from which the jury could find that at that time the officers were fired upon by a sniper, thus hereinafter we state as fact that a sniper existed and that he fired.[3] A newsman who was in the area testified: "Shortly after we arrived I began shooting film, and it was soon after that I felt a bottle shatter at my foot, sprayed my ankle with glass. I heard a report; a bullet went past my ear and I heard it ricochet off the wall behind me." An MHP officer testified that he saw a black male break out the western pane of the third window from the bottom of the West Wing of Alexander Hall and fire

3. Plaintiffs concede that the jury could so find.

two shots in his direction from a handgun. At least 18 patrolmen testified to seeing two or three muzzle flashes come from the eastern pane of the same window. Other patrolmen saw muzzle flashes in either one of the upper windows or at the top of Alexander Hall, and a score of additional policemen and patrolmen heard shots from the general vicinity of Alexander Hall. At or about this time a patrolman and a JPD officer were struck by thrown bricks and knocked down.

Several patrolmen or policemen cried "sniper" or "sniper third floor" or "sniper third window." Almost simultaneously 38 MHP patrolmen opened fire, 30 with shotguns, five with their personal military carbines, two with submachine guns, and one with a .308 rifle. The range from where they stood to the window was approximately 20 yards. About half testified that they fired into the third floor stairwell window. Five of the patrolmen directed their fire at the brick wall alongside the upper story windows. Others directed their fire toward or just over the roof. Three patrolmen fired not at a specific window or over the roofline but at what may be described generally as the upper portions of the West Wing. One patrolman, without aiming or bringing his shotgun to his shoulder pointed it in the direction of the top of the West Wing and fired four times. Another fired first from the hip, then, as fast as he could lever shells into his gun, shot in the general direction of the top of the building. MHP Inspector Vinson did not shoot toward the West Wing at all but fired his carbine toward Roberts Hall, across Lynch Street from Alexander Hall, firing into the ground behind a running black male figure to run him under cover.

Only five JPD policemen fired their weapons. They discharged their shotguns into the air at an angle of about 85 or 90 degrees, firing a total of seven rounds of number 1 buckshot.

Throughout the barrage of gunfire Lt. Magee repeatedly called for the men to cease fire. At trial he recalled the scene:

Q. What happened when the firing broke out?

\* \* \* \* \* \*

A. Well, when the shooting began, naturally I flinched, any reaction, I flinched and dropped a little bit and looked up. I didn't know where the shooting was coming from. I didn't know what it was.

As I looked up I saw a window in the dormitory break and just about that time something hit that transformer over my head and it exploded, and I realized the shooting was coming from my rear, and I immediately turned and took the bull horn and immediately began ordering cease fire.

Q. How many times did you order, cease fire, before the firing stopped?

A. Sir, I can't say, I don't know.

Q. Do you recall giving the testimony at your deposition that you gave the order at least three, four, or five times?

A. Yes, sir.

Q. And the firing went on all the way through that, didn't it?

A. Sir, I continually ordered, cease fire, and the order continued until the firing did cease, which I understand, was twenty something seconds. Now it took me a few seconds to turn and start giving the order.

Other officers—JPD Sergeant Lee, MHP Inspector Cooper, and MHP Inspector Jones—joined Lt. Magee in calling for cease fire. Approximately 29 seconds after the outbreak of gunfire the firing stopped. Based on defendants' own testimony, plaintiffs have calculated that during those 29 seconds the officers discharged from 121 to 153 rounds of ammunition containing between 793 and 1,001 separate projectiles.

## B. THE EFFECT OF THE GUNFIRE.

The appearance of the West Wing after the firing is shown by PX 133.

From ground level to roof the central row of windows and metal panels were damaged. Portions of glass in the ground level doors had been shot away. Every pane in every window and every metal panel had been damaged. The western panes of the top window and the next window down had been virtually shot out. The eastern portion of the second window from the top, the pane behind which the sniper had been located by the testimony and at which numerous patrolmen had directed their fire, was unmarred.[4]

The effect of the fire laid down by the officers was not confined to the West Wing but ranged eastward across the center portion of Alexander Hall. The exterior of the center portion's first floor consisted of six large glass panes. Three of these six panes had been penetrated from the outside by a total of 35 projectiles, and one portion of one of the panes had been shot away. Damage from bullets or shot also ranged along the second floor of the center section, and it was here, in a TV room, that one of the non-litigant victims was shot. There were four holes in the windows of one room on the fifth floor in the eastern part of the center section, three more bullet marks below these windows, and two bullet holes through furniture in the room. The fire ranged even farther east to the East Wing, where some damage was sustained on the second floor. Finally, the FBI counted 15 holes or indentations in a retaining wall in front of Roberts Dining Hall, across the street from Alexander Hall.

Personal injuries were similarly widespread. Tuwaine Davis [4-A] was struck while in the stairwell between the third and fourth floors of the West Wing. Vernon Weakley, who had been standing at ground level in front of the West Wing, was hit in the leg. Leroy Kenter was shot as he attempted to run westward in front of the West Wing. Phillip Gibbs was found mortally wounded in the courtyard slightly to the east of the West Wing, with head wounds caused by two pellets of number .1 or 00 buckshot. James Earl Green was found on the sidewalk, across Lynch Street and in front of Roberts Hall, dead from a single pellet of number 1 or 00 buckshot that passed through his heart. Four other persons not parties to this litigation were wounded in front of and inside the entrance to the West Wing, one in the West Wing stairwell between the first and second floors, another between the second and third floors, and still another as far away as the TV lounge on the second floor of the center section of Alexander Hall.

Investigators could not trace the path of any of the projectiles to determine which specific persons fired them. Nor were shotgun pellets recovered from those wounded or killed traceable to specific weapons since a shotgun does not leave distinctive markings on its projectiles. The FBI, however, inserted a rod through holes in the double-walled metal panels and sighted along the rod's length. Seventeen sightings were made, and each indicated the projectile causing the hole originated from a point on Lynch Street where the MHP patrolmen had been clustered.

The barrage of gunfire far exceeded the response that was appropriate for a detachment the size of this one and under the circumstances which it faced. This conclusion is not judicial second guessing of officers faced with danger, rendered from the quiet and safety of judges' chambers. It is what the evidence shows. The testimony touching the issue of appropriate response from a large detachment coming under sniper

---

4. The FBI, which conducted an investigation after the shooting, counted 250 holes or indentations in the windows, surrounding metal frames, and metal panels. This tally did not include holes or indentations in the glass doors at ground level and indentations in the walls alongside the windows. Obviously, it did not include marks from any projectiles that may have passed through portions of windows shot out.

4-A. Since married. Now Mrs. Tuwaine Davis Whitehead.

fire uniformly rejected as unacceptable the barrage that took place at Jackson State. Under the evidence, the fire was excessive in volume and in intensity, and the size of the area subjected to fire was beyond the physical limits of justifiable response. Neither at trial nor on appeal have the MHP defendants, to whom the issue was particularly significant, squarely addressed themselves to the issue of overall excessiveness of response. Instead they have assumed that the validity of responsive action is measured solely by inquiring whether each officer was authorized to respond in the exercise of his individual discretion. They have not wrestled with whether such an authorization was improper because it might produce an excessive cumulated use of deadly force such as occurred in this instance.

Major General Walter Johnson, commanding officer of the Mississippi National Guard (who was at Jackson State the night of the shooting but not at the scene), testified concerning Guard procedures under sniper fire. He described the Guard's methods of crowd control— use of large numbers of people, non-lethal gas, riot control batons, rifle butts, riot guns "not loaded with buck shot but loaded with No. 9 bird shot, aiming not at the face but at the knees," and overall the use of minimum physical force. He testified also:

Q. What has the reaction of the Guard been to the sound of small-arms fire?

A. They [guardsmen] hold their formation. Now I don't mean to imply that we won't react if we are ever fired upon and someone is hit. I take a pretty dim view of someone shooting out of a darkened building or behind a tree or something like that and hitting one of my men. I take a pretty dim view of that and of course I would react, I think, properly. I don't think a sniper has any—I think he just forfeits all his rights when he starts sniping.

　　*　　*　　*　　*　　*　　*

Q. Under what circumstances would an order be given to return fire? [Except for small patrols, the Guard permits return fire only upon the command of an officer to load and fire.]

A. If we actually took fire—in other words a ricochet by your foot or something like that—now we are not going to fire into a crowd because we've picked up one. But if we can isolate this man we will first try to capture him, but if he can't be captured he will be [k]illed. We have specially trained sniper teams with sniperscopes, infra-red night firing sniperscopes. We have heav[y] lights. Very often, as has been reported, say, in Watts, you will get a lot of sniper fire from tops of buildings or from the dark, and we will try to search out and put a stop to that.

Q. If your men were in front of a darkened building and sniper fire started coming from a window, what would their response be according to your standard operating procedure?

A. Probably give the order to take cover and disperse immediately. No point in just standing there. We would take cover and protect ourselves and the special sniper teams would attempt to search out, seize or destroy.

Q. Would this be true if it were a riot control situation as well?

A. I don't follow you.

[Q] Well, let's say in addition to having a single sniper possibly firing from a window you had people on the street milling about, some of them hurling objects, some of them shouting epithets. Would that answer that you gave hold true as well?

A. We would probably lay down a tear gas barrage or CS barrage.

Wesley Pomeroy, a career law enforcement officer and an expert in the con-

trol of civil disturbances testified. Previously he had advised the JPD as a consultant. He had planned and directed a five-day seminar at the University of Mississippi for Mississippi law enforcement officers, called "Days of Dissent."[5] He testified without contradiction that according to standards generally accepted by law enforcement agencies throughout the United States, firepower of the kind used at Jackson State was never an appropriate response to sniper fire, particularly when there are large numbers of people in the vicinity. He gave as his opinion that the firepower used at Jackson State was unwarranted because:

> [A]ccording to generally accepted, universal[ly] accepted standards by law enforcement throughout the United States 'massive retailatory [sic] general firing power of that kind is never an appropriate response to sniper fire, particularly when there is a number of other people who are in the vicinity who are not participants.[6]

Additionally, the two sergeants of the JPD who were trained, equipped and designated to deal with snipers never fired. Most of the JPD officers withheld their fire, while the five who did discharge their weapons fired a total of seven rounds into the air.

We turn now to questions of liability.

## C. STATE AND CITY IMMUNITY FROM SUIT.

The trial judge correctly held that both the state and the city enjoyed sovereign immunity. The state's claim of immunity from suit in a federal court bottomed on the Eleventh Amendment is a good defense. See, e. g., Wright, Federal Courts, 2d ed. § 46. Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), which permitted a cause of action against federal agents for violation of certain constitutional rights although Congress had enacted no statute creating such a cause of action, has not destroyed or supplanted in part the immunity conferred upon states by the Eleventh Amendment.

The city is immune from suits brought under § 1983. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973).

Under Mississippi law, in the absence of express statutory authority, the state cannot be sued for the negligence of its officers, agents or employees. Lowndes County v. State Highway Comm'n, 220 So.2d 349 (Miss.1969); Curtis v. State Highway Comm'n, 195 So.2d 497 (Miss. 1967); Horne v. State Bldg. Comm'n, 233 Miss. 810, 103 So.2d 373 (1958);

5. Pomeroy served as a uniformed officer with the California Highway Patrol and later as undersheriff of a California area where he was in charge of civil disturbance duties. He has directed conferences on prevention and control of civil disorders sponsored by the International Association of Chiefs of Police and funded by the Department of Justice. Later he became special assistant to the Attorney General of the United States charged with procedures for protecting U. S. government buildings from civil disorders, and served as liaison or coordinator in dealing with several civil disturbances, and he became Associate Administrator of the LEAA (Law Enforcement Assistance Administration).

Pomeroy resigned from LEAA to become a consultant on prevention and control of civil disorders, and it was in this capacity that he advised the JPD and conducted the University of Mississippi seminars. In addition to his work as consultant he is Director of Safety and Development for the University of Minnesota.

6. Additionally, the evidence disclosed that the second phase of large detachment anti-sniper action is to send a team into the building to find and subdue the pinned down sniper. That procedure was never carried out at Jackson State. There is no substantial evidence that any search was even made of the particular window area or the stairwell to find if the sniper had been killed, wounded, or had escaped.

Ayres v. Board of Trustees, 134 Miss. 363, 98 So. 847 (1924). And a city is immune from liability for the torts of its police officers. "This State, along with the overwhelming majority of the others, adheres to the rule that municipalities are immune from liability for the torts of its officers, agents, and employees while engaged solely in matters pertaining to the police powers of the city." Anderson v. Vanderslice, 240 Miss. 55, 126 So.2d 522 (1961). Accord, Twiner v. Jenkins, 257 So.2d 488 (Miss. 1972); Simpson v. Poindexter, 241 Miss. 854, 133 So.2d 286 (1961); City of Hattiesburg v. Buckalew, 240 Miss. 323, 127 So.2d 428 (1961); Bates v. City of McComb, 181 Miss. 336, 179 So. 737 (1938).

## D. SOURCES OF LIABILITY.

■■ Throughout the remainder of this opinion we refer to the common law of tort with particular reference to Mississippi law. In the context of the present case any liability of the defendants under § 1983 could be no broader than their liability under Mississippi law. In Whirl v. Kern, 407 F.2d 781 (CA5, 1969), we held that an "improper motive" or purpose on the part of defendants was not an element of a cause of action under § 1983. We noted, however, citing Pierson v. Ray, 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288, 296 (1967), that, "the purpose with which an unconstitutional act is done is highly relevant to recovery under § 1983, but relevant more as a source of defenses springing out of the common law of torts than as an obstacle to the

statement of a § 1983 cause of action." *Id.* 407 F.2d at 789. See also Scott v. Vandiver, 476 F.2d 238, 242 (CA4, 1973) (federal court may allow raising defenses recognized by state common law to contest a § 1983 claim); Tuley v. Heyd, 482 F.2d 590, 594 (CA5, 1973) (question of sheriff's vicarious liability under § 1983 for acts of his deputy is controlled by state law); Martin v. Duffie, 463 F.2d 464, 468 (CA10, 1972) (federal courts look to, though they are not bound by, state decisions in formulating standards in civil rights actions). We entertain no doubts that the privilege of individual police officers to fire in self defense or to quell a riot are such common law defenses and may be asserted in response to the § 1983 cause of action to the same extent that they are relevant to the pendant Mississippi law claim. Similarly the Mississippi and general tort law requirements respecting proof of causation are so much a part of "the background of tort liability that makes a man responsible for the natural consequences of his actions," Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L. Ed.2d 492 (1961), that it is necessary to apply them to the § 1983 claim in this case. *See, e. g.*, Pierson v. Ray, 386 U. S. 547, 555, 87 S.Ct. 1213, 1218, 18 L. Ed.2d 288, 295 (1967) ("prevailing view [of tort law] in this country" relied on in establishing standards for false arrest type action under § 1983); Anderson v. Nosser, 456 F.2d 835, 841 (CA5, 1972) (en banc) (applying general tort principles of proximate causation to support a jury verdict for defendants in a § 1983 action).[6A]

---

**6A.** We indicate in the text that § 1983 liability in this case would be no broader than liability under Mississippi law. Similarly we suspect that it would be no narrower, see generally 42 U.S.C. § 1988 and our interpretation thereof in Brazier v. Cherry, 293 F.2d 401, 409 (CA 5, 1961), though we need not decide that question here. It is arguable that § 1983 requires conduct approximating that involved in an intentional tort even though "specific intent" or "improper motive" is clearly not required. See W. McCormack, Federalism and Section 1983: Limitations on Judicial Enforcement of Con-

stitutional Protections, Part I, 60 Va.L.Rev. 1, 54–55 (1974). The Fourth Circuit, however, has applied § 1983 to grossly negligent conduct, Jenkins v. Averett, 424 F.2d 1228 (CA 4, 1970), and it is arguable that we have done so in Whirl v. Kern, 407 F.2d 781 (CA 5, 1969). See Jenkins v. Averett, *supra*, and Byrd v. Brishke, 466 F.2d 6 (CA 7, 1972), both of which read *Whirl* as based on the defendant's negligence. See also Robinson v. Jordan, 494 F.2d 793, p. 795 (CA 5, 1974). *Cf.*, Roberts v. Williams, 456 F.2d 819 (CA 5, 1972); Anderson v. Nosser, 456 F.2d 835 (CA 5, 1972) (en banc). It is not

■ Mississippi imposes the highest degree of care upon a person handling firearms.

The highest degree of care is exacted of a person handling firearms. They are extraordinarily dangerous, and in using them extraordinary care should be exercised to prevent injury to others. We quote from Cooley on Torts (3d Ed.) p. 1232, as follows: "A high degree of care is necessary in the use or manipulation of loaded weapons in the presence or vicinity of other persons, and where injury results from a failure to exercise such care the defendant is liable." We take the following rule from Barrows on Negligence, p. 367: "The bearer of loaded firearms is bound to exercise the utmost diligence in their handling, and he is liable for any injury caused by their discharge, unless it appear that he was entirely without fault."

State to Use of Johnston v. Cunningham, 107 Miss. 140, 65 So. 115, 118 (1914), (in which an officer fired over the head of a fleeing misdemeanant). See also Roberts v. Williams, 302 F.Supp. 972, 986 (N.D.Miss.1969), aff'd, 456 F. 2d 819 (CA5, 1971), cert. denied, 404 U. S. 866, 92 S.Ct. 83, 30 L.Ed.2d 110 (1971), modified, 456 F.2d 834 (CA5, 1972).

■ The defendant officers claim that their conduct, even if otherwise it would not comply with Mississippi's very high standard of care, was justified by privileges which made it not tortious. They assert the privilege of self defense and the privilege incident to the existence of a riot. With respect to self defense, under general principles of tort law one is entitled as a matter of self defense to employ deadly force to repel deadly force. Restatement Second of Torts (hereinafter "Restatement Second") § 65. Under Mississippi law retreat is not a prerequisite to use of deadly force. McCall v. State, 29 So. 1003 (Miss.1901); Conner v. State, 13 So. 934 (Miss.1893). There was evidence from which a jury could conclude, with respect to almost all officers, that each was within the scope of the privilege of self defense. Substantially all officers were aware that deadly force in the form of sniper fire was being exerted. Nearly all testified to fear of death or serious bodily harm from that fire.

■■ With respect to riot, under general principles one may use deadly force "for the purpose of suppressing a riot or preventing the other [person] from participating in it . . . if the riot is one which threatens death or serious bodily harm." Restatement Second § 142(2). In this case a jury could find that there was in progress "an assemblage of three or more persons in a public place for the purpose of accomplishing by concerted action and in a turbulent and disorderly manner a common purpose," id. § 142, Comment a.[7] It was not necessary that the avowed purpose of the participants in the assemblage be that described in § 142 of the Restatement Second but only that the conduct of the participants was such as to create the probability or even the

necessary for us to and we do not decide here whether negligence or gross negligence is sufficient under § 1983. Nor do we decide whether the conduct of the individual officers in this case could fairly be characterized as "intentional" for purposes of § 1983. Rather our, analysis proceeds in terms of application of Mississippi law to the pendent state claim, since even if we concluded that the § 1983 claim ultimately failed it is clearly substantial enough, and the factors of judicial economy compelling enough, to give us jurisdiction over the pendent claim under United Mine Workers v.

Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed. 2d 218 (1966), and its progeny.

7. This was the language which the judge used in his charge. Insofar as this case is concerned, it is not materially different from the Mississippi statutory definition:

"A 'riot' is any use of force or violence disturbing the public peace, or any threat to use such force and violence, if accompanied by immediate power of execution, by two (2) or more persons acting together and without authority of law."

Miss.Code Ann. § 2361.5–01(A) (repealed with the enactment of the 1972 Code).

possibility of such consequences. *Id.* comment g.

 Under these standards the jury could find that a riot was in progress even though at the precise time of the firing the crowd in front of Alexander Hall was beginning to disperse at the orders of Lt. Magee· and at the moment there were no overt acts sufficient to cause Lt. Magee to believe tear gas necessary. The absence of disorderly acts at the precise moment was not determinative. The crux of the matter was an assemblage with the aim of accomplishing a common purpose by turbulent action and in a disorderly manner. The jury could conclude that the riot was one which threatened death or serious bodily harm. Prior to the time firing began numerous officers had been struck by missiles, and some of them injured, and two had just been felled by bricks. The fire from the sniper was part and parcel of the situation.

 The privilege of employing deadly force to subdue a riot was not made inapplicable by the fact that in his opening statement and in argument before the trial court counsel for the MHP defendants stated that his clients did not rely upon the justification of quelling a riot, or by the fact that in testimony no MHP officer characterized his firing in riot-suppression terms. The testimony of each officer, describing his action in terms of defense against sniper fire or of pinning down the sniper, or both, did not eliminate the jury's right to recognize the sniper fire as a particularized aspect of the riot, indeed at the moment perhaps its most inflammatory and most dangerous aspect, and conclude that in firing responsively the officers were quelling the sniper fire and dissuading others from joining in.[8]

Under the facts of this case the privilege of self defense and the privilege of use of deadly force relating to a riot partially overlap. As we have held, a jury could conclude that a riot was in progress,[9] that it threatened death or serious bodily harm, and that the sniper was part and parcel of the situation. A jury could consider whether fire directed at the sniper for defensive purposes was within the contours of fire tending to quell the riot in general or the sniper as a particular part thereof or tending to dissuade others from joining in the riot in any manner. A jury could also consider whether fire to quell the riot (or the sniper as an element thereof) or to dissuade others from joining in the riot was delivered in such a manner as to be within the contours of fire for self defense.

 Inquiry must then turn to the allowable scope of permitted deadly force and the manner of its employment. A privilege to use deadly force is not unrestrained; rather it is subject to limitations of scope and of manner of exercise. When self defense is claimed, the actor is not privileged to use any means which is intended or likely to cause bodily harm in excess of that which he correctly or reasonably believes to be necessary for his protection. Restatement Second § 70(1). Comment b. to that subsection provides:

> b. *How reasonableness of means determined.* In determining whether a particular means is or is not excessive, the amount of force exerted, the means or instrument by which it is applied, the manner or method of applying it and the circumstances under which it is applied are factors to be considered. There may, under ordinary circumstances, be a privilege to apply a particular amount of force, to apply it in a particular way, or to use a particular weapon, but the circumstances which are known or which should be known to the actor may be such as to indicate to a reasonable man in the actor's position that the

---

8. The trial judge, separating the issues from the semantics more perceptively than did counsel, properly charged the jury on riot as a justification.

9. See text at footnote 7, *supra.*

use of this ordinarily privileged means may involve a danger of harm to the other which the actor is not privileged to inflict intentionally. Thus, a man may be privileged to knock another down if the other threatens him with violence, where both are upon a street or lawn, but he is not privileged to do so if the other is standing on the brink of a precipice or if he knows or should know that the other is suffering from heart disease.

Whether a means of self-defense is excessive depends upon the bodily harm or confinement which the actor intends to cause, or the harm which he has reason to believe is likely to result. Thus, means are excessive if the actor should realize that they are likely to do more harm or impose a greater confinement than he either intends or is privileged to inflict; but they do not become excessive because they unforeseeably result in such harm or confinement.

The actor must believe that the means which he applies are necessary to prevent the apprehended harm and not merely that they are likely to be effective in preventing it. Not only must the actor so believe, but, except where the means are actually necessary, his belief must be reasonable, that is, the circumstances which are known or should be known to the actor must be such that a reasonable man would so believe. In this connection, the qualities which primarily characterize a reasonable man are ordinary courage and firmness.

The actor must consider whether lesser force will prevent the apprehended harm. Thus Comment c. provides:

*c. When lesser force would afford adequate protection.* The actor is not privileged to apply a particular force if he knows or should know that the apprehended harm can be prevented by the application of a force less in kind or degree; and this is true though the force applied is such as

would be privileged if the actor reasonably believed that the apprehended harm could only be prevented by its use. In determining whether the actor is privileged, allowance must be made for the exigency in which the actor is placed by the other's conduct, and the necessity for a rapid decision as to the means which he will use in his own defense. Even the most reasonable of men, confronted with the necessity of defending himself against a real or apparent attack, cannot be expected to measure accurately the exact amount of force necessary to repel it. It is only where there is a glaring discrepancy between the force applied and that which is necessary to prevent the apprehended harm, or where it is obvious that the actor knows or should know that he can defend himself by a lesser force that it is for the court to rule that the force applied is excessive. Otherwise it is for the jury to determine whether the force is or is not excessive.

A privilege must be exercised with due regard for the interests of third persons. A privilege to use deadly force is not a hunting license entitling the privileged person to strike without regard to risk of harm to third persons.

§ 75. *Liability to Third Person*

An act which is privileged for the purpose of protecting the actor from a harmful or offensive contact or other invasion of his interests of personality subjects the actor to liability to a third person for any harm unintentionally done to him only if the actor realizes or should realize that his act creates an unreasonable risk of causing such harm.

\* \* \* \* \* \*

*Comment:*

*a.* This Section states the rule that one who unintentionally harms a third person by an act which is privileged as self-defense against a real or supposed assailant is subject to liability if, but only if, his act is negligent toward such third person as creating an

undue and so unreasonable risk of causing an invasion or impairment of some of the legally protected interests of the third person.

b. In determining whether the actor as a reasonable man should be aware that his act creates an unreasonable risk of causing an invasion of any of the third person's interests of personality, the factors which are to be considered are similar to those which determine the existence of negligence in many other situations. These factors and the importance attached to them are stated in Chapter 12. The exigency in which the actor is placed, though not due to the third person's conduct, with its attendant necessity of an almost instantaneous choice of a means of self-defense, is here a factor of great importance. So, too, is the comparison between the value of the respective interests of the actor and the third person, and the amount of harm likely to result to each if the actor adopts or refrains from adopting the particular means of self-defense which he employs.

Restatement Second § 75.[10]

In Dillon v. Crowe, 406 F.2d 1321 (CA5, 1969), we recognized the dual limiting factors of scope of force and manner of exercise. Officers had raided a dice game and arrested participants, a scuffle ensued between an officer and a gambler, the officer attempted to draw his pistol to enforce the arrest, and it accidentally discharged when the gambler struck his arm. The bullet struck plaintiff's decedent. We affirmed a judgment for the officer-defendant, holding that the facts supported the conclusion that the officer used only such force as was necessary and that he was not negligent. With respect to scope of allowable force, Mississippi has held liable an officer who shot and killed a misdemeanant attempting to escape cus-

tody, holding that the officer's exercise of deadly force is limited to that necessary to subdue the efforts to escape and that even then he cannot take the prisoner's life or inflict great bodily harm on the prisoner except to save his own life or prevent like harm to himself. Brown v. Weaver, 76 Miss. 7, 23 So. 388 (1898); Holland v. Martin, 214 Miss. 1, 56 So.2d 398 (1952); Moore v. Foster, 182 Miss. 15, 180 So. 73 (1938). To like effect, where the sheriff shot in attempting to stop a youth fleeing arrest on a misdemeanor charge, see State v. Cunningham, *supra.*

■ We conclude that the limits of the privilege relating to riot are similar. The privileged actor may not use means intended or likely to cause bodily harm in excess of that which he correctly or reasonably believes to be necessary to quell the riot or to dissuade others from participating.

■ One having a privilege but exceeding the scope of conduct which it allows is liable for so much of the force exerted by him as is excessive. *See, e. g.,* Restatement Second §§ 71 and 144; 6 Am.Jur.2d, Assault & Battery § 162; Fraguglia v. Sala, 17 Cal.App.2d 738, 62 P.2d 783 (1936); Bethley v. Cochrane, 77 So.2d 228 (Ct.App.La., 1955). Where it is not possible to separate harm caused to the victim by authorized force and that caused by an excess of force, the actor is liable for all of the harm. Restatement Second § 71, Comment b.

The training of MHP members in control of crowds and of riot and sniper situations became of great if not central importance in determining whether the conduct of the officers in handling firearms was reasonable under Mississippi standards of care, whether conduct that otherwise might be tortious was privileged, and whether the scope of privileged conduct was exceeded.[11] Plaintiffs

---

10. For example, some of the officers testified that an officer coming under fire of a sniper closely surrounded by a crowd would not be free to respond by shooting indiscriminately into the crowd.

11. The procedures of the JPD are evidentiary of what is appropriate for police officers in general but are less central to the case since we hold that directed verdicts against JPD officers who fired were properly denied on other grounds.

contend that under Mississippi law the training of the MHP constituted administrative regulations the breach of which was negligence per se. We do not agree.

Breaches of statutes have been held to constitute per se negligence in Mississippi. See Daniels v. Adkins Protective Serv., Inc., 247 So.2d 710, 712 (Miss. 1971); Illinois Cent. R. Co. v. Bethea, 88 Miss. 119, 40 So. 813 (1906); Mobile & O. R. Co. v. Roberts, 23 So. 393 (Miss.1898). In Robertson v. Yazoo & M. V. R. Co., 154 Miss. 182, 122 So. 371 (1929), the court adopted in toto § 176 of the Tentative Draft of the First Restatement, which became § 286 of the First Restatement.

Section 286 was changed when carried forward to the Second Restatement. It now makes acceptance of a statute as the appropriate standard of care discretionary with the court. ("The court *may* adopt . . . ."). As the comments make clear, use of the discretionary "may" was not accidental:

> [The regulation] . . . may merely prohibit certain conduct, and contain no provision for any liability at all. In such cases the initial question is whether the legislation or regulation is to be given any effect in a civil suit. Since the legislation has not so provided, the court is under no compulsion to accept it as defining any standard of conduct for purposes of a tort action.

Restatement Second § 286, Comment *d*.

Daniels v. Adkins Protective Serv., Inc., *supra*, a 1971 case, discusses the effect of a violation of law upon the negligence issue. It points to the conclusion that the Second Restatement's reformulation of § 286, which was completed in 1963, would find no favor in Mississippi, and that the more rigid First Restatement rule would prevail, leaving courts no discretion to decline to regard a statutory violation as conclusive proof of negligence.

The First Restatement, however, spoke only of "legislative enactments." It made no mention of either ordinances or administrative regulations. There appear to be no Mississippi cases expressly applying the doctrine to violations of administrative regulations. In view, however, of Mobile & O. R. Co. v. Roberts, *supra*,[12] we believe that the Mississippi courts, if they faced the question, would give some weight to violation of administrative regulations in considering the negligence issue. But that does not end the analysis. The theory of what is loosely called statutory negligence or negligence per se is that a clear official definition of appropriate conduct[13] should be regarded as evidence of the proper standard of care for the reasonable man.[14] That theory is undercut when, as here, there has been no clear official definition. MHP training in crowd control and related subjects was neither reduced to precise form nor was it the subject of any formal adoption procedure. Rather, the subject matter was part of patrol training, communicated to patrolmen and trainees through programs conducted by various officers at various times and places. Commissioner Crisler explained that every recruit receives riot control training in recruit school, and every patrol member receives yearly in-service training in that subject, and in addition, some of the Highway Patrol Districts conduct training on their own. The content of such training was described at trial through the oral testimony of those teaching and those taught, and the de-

---

12. In *Mobile* the Mississippi Supreme Court in dictum appeared willing to give negligence per se effect to the violation by a railroad company of its own operational rule that trains were to follow each other at intervals of no less than 10 minutes.

13. Or, more usually, a definition of conduct not appropriate.

14. Under § 286 of the First Restatement the statute is conclusive evidence, requiring the judge to direct a verdict of negligence in violation is proved. The Second Restatement formulation accords the judge discretion to regard the statute as probative of the correct standard of care but not conclusive.

scriptions varied considerably. We think that under such circumstances the Mississippi Supreme Court, if it gave the training any weight, would regard it as no more than probative of the correct standard of care and not as conclusive.[15]

As we have pointed out, the testimony of MHP officers regarding their training varied considerably. In ruling on motions for directed verdict the court was required to give effect to that testimony of the officers and of the experts tending to give to the officers the widest latitude of conduct. Considered in this manner, the testimony embraced training in what may be generally described as two separate (but overlapping) types of responsive fire that individual officers could engage in when subjected to the fire of a sniper-defensive fire and fire to "pin down" the sniper. Defensive fire embraces the privilege of the officer to fire at the sniper or at his location when the officer fears that he or his fellow officers are in danger of death or serious bodily harm from the sniper's fire. In effect it is an embodiment in police training of the right to act in self defense against a particular kind of deadly force. Before an officer can fire in this manner he must have either actually observed the sniper or definitely established his location. The fire is directed at the particularized point where the sniper has been observed or located, and it may kill or injure the sniper or as a minimum silence him. There was voluminous testimony that an individual officer receiving sniper fire can fire defensively on his own initiative without command if he thinks his own life or that of a fellow officer is threatened, if he knows that he is being fired upon by a sniper and if he has actually sighted or otherwise located him. Also there was substantial testimony that this right of the MHP officer to act defensively on his own ini-

tiative exists even if he is a member of a large detachment.

Fire to pin down the sniper is a somewhat broader concept. Its purpose is not necessarily to kill or wound the sniper but to cause him to stop firing, to stay down, and to remain in place. Its purpose may be achieved by firing at a place or places not precisely limited to the sniper's exact location. MHP officers testified that any member of a large detachment can fire without command to pin down a sniper. Locating him precisely is not a sine qua non. For example, an officer may call out "sniper fire at three o'clock" to identify an approximate direction from which fire is coming. Once a direction is established officers may fire and are not limited to a precisely targeted spot.

■ Obviously, the two concepts of type of fire overlap. Defensive fire may pin the sniper down. Fire to pin him down may kill or wound him. Either type of fire will, hopefully, silence him. Additionally, fire to pin down a sniper can be considered as a form of self-defense (less stringent because not necessarily directed precisely at the sniper or his location) or a particularized form of quelling a riot. Both types of fire, comprising particularized training given to MHP officers concerning what they can and should do in the face of sniper fire, are, of course, subject to the same limitations as other forms of privileged deadly force with respect to the interests of third persons—the actor is liable if he realizes or should realize that his acts create an unreasonable risk of harm to third persons. Restatement Second § 75.

## E. LIABILITY OF OFFICERS WHO FIRED.

■ We have considered officer by officer the liability of those who fired their weapons.

---

15. The District Judge was of the same view. He charged that the training, regulations and procedures for crowd and riot control adopted by the MHP and the JPD were evidence of reasonable conduct and the degree of care required, and failure to follow such instructions could be considered as evidence of negligence.

At the threshold, there was no error in denying the motions for directed verdicts against the five JPD officers who fired. Under the undisputed evidence all of them shot into the air at an angle approaching 90 degrees. A jury could find that their action was an acceptable procedure for meeting a riot situation without undue risk of harm to persons at the scene and that they were guilty of no tortious conduct.

Under Boeing v. Shipman [16] standards we have scrutinized the testimony of each MHP defendant who fired. With respect to 31 of the 38 we find without hesitation that there was sufficient evidence on which a jury could conclude that each's respective acts of firing were not unreasonable under the circumstances, [17] or if otherwise unreasonable were justified under the privilege of self defense or the privilege relating to riot, and a jury could find that the fire laid down by each did not exceed that necessary for the purpose and was not otherwise delivered negligently.

With respect to the remaining seven MHP defendants who fired, the issue of possible liability as a matter of law is closer. We discuss the acts of these seven separately. After the shooting began, Assistant Inspector Charles G. Vinson saw a black male figure come out of bushes in front of the dining hall (across the street from Alexander Hall and thus generally behind the detachment) and run to the west. He fired three or four aimed shots from his carbine into the grass 20 feet or less behind the running figure "to run 'em under cover." Vinson does not claim that the person was a sniper, in fact Vinson could not tell whether he was armed. If Vinson was within a privilege it was that relating to a riot. No explanation was offered of the necessity or desirability of

forcing one out of several hundred persons present to take cover, whatever that meant in these circumstances. Patrolman Jerry Arthur Jones saw a flash from the window, heard two reports, and fired two to four rounds from his shotgun, "just as fast as I could jack another one in." The first shot was fired from the hip as he brought his gun up, not aimed but in the direction of "somewhere toward the top of the building." He considered that he did not have time to aim at the window and thought it possible that this shot may have gone into the top window instead. Patrolman James Woodrow Bennett, without ever identifying a possible source of sniper fire and without bringing his shotgun to his shoulder or aiming it, fired five times, once into the air from a high port position, four more times by "pointing" his shotgun toward the top of the building. Patrolman Joseph Wayne Braun saw two flashes of fire from the second window down and then raked the top of the dormitory with a 10 round burst from a submachine gun set to fire automatically at 700 rounds per minute. [18] Investigator Ralph Curtis McClain identified the second window down as the source of sniper fire but rather than fire at that location shot just over the roof line on the theory that anyone there would be a sniper and that he was entitled to fire at anyone on the roof whether sniper or not. Patrolman Donald Robert Blackwell identified no location as the source of fire but nevertheless shot into the second window from the top because he thought sounds of fire came from that direction and because others were firing into that window. Patrolman Billy Frank Wheeler heard shots, could not tell where they came from, and fired two rounds from his shotgun into the window because he saw a movement of the curtains.

16. 411 F.2d 365 (CA 5, 1969) (en banc).

17. For example, a few MHP officers testified that, like the five JPD officers, they fired into the air, although not at so high an angle. Without regard to privilege a jury

could find that this did not breach Mississippi's standard of care.

18. Had every officer fired 10 times, the detachment would have shot 690 times, and the number of projectiles would have been in the thousands.

■ ■ Even if, however, any one or more of these seven was liable as a matter of law (by failing to bring himself within any privilege, or, if privileged, by employing excessive deadly force or by employing privileged force in a manner which he realized or should have realized created an unreasonable risk of harm to others) directed verdicts against such person(s) were properly denied because of the state of the evidence respecting causation. The proof did not establish as a matter of law that any one or more of them inflicted the harm suffered by any one or more of the victims whose claims are before us. Under the usual burden plaintiff must introduce evidence affording a reasonable basis for concluding that it is more likely than not that the conduct of defendant was a substantial factor in bringing about the harm suffered by the plaintiff. Prosser, Law of Torts § 41, p. 245 (3d ed. 1964). No plaintiff established, at most, any more than a jury question pursuant to this burden. Plaintiffs seek, however, to avoid this normal burden of proof on the authority of Moore v. Foster, 182 Miss. 15, 180 So. 73 (1938), and Oliver v. Miles, 144 Miss. 852, 110 So. 666 (1926), and on the supporting argument that in a group action situation where proof of actual causation is difficult or impossible, loss should fall on a negligent defendant who may have inflicted no harm rather than upon a blameless plaintiff injured by someone who cannot be identified. In *Oliver* two defendants who were bird shooting negligently fired their shotguns across a public highway at approximately the same time, and plaintiff was struck with a pellet which could have come from either gun. The Mississippi Supreme Court held that both defendants were negligent and both liable despite the absence of proof of who committed the actual harm, because "to hold otherwise would be to exonerate both from liability, although each was negligent, and the injury resulted from such negligence." 110 So. at 668. In *Moore*, two officers negligently fired their pis-

tols over the head of a youth escaping arrest, and a bullet from one of the pistols struck him. The Mississippi Supreme Court, citing *Oliver*, held that both officers would be liable (only one of them was sued).

■ As we understand them, these two cases do not impose liability as a matter of law on multiple defendants merely upon proof that as a matter of law they negligently fired weapons. Professor Prosser describes cases such as *Moore* and *Oliver* as examples of "clearly established double fault and alternative liability."

There is one special type of situation in which the usual rule that the burden of proof as to causation is on the plaintiff has been relaxed. It may be called that of clearly established double fault and alternative liability. Where, for example, two defendants negligently shoot across a public highway at the same time, and the plaintiff is struck by one shot, which might have been fired from either gun, it is clear that both marksmen were at fault, and that one of them, and only one, has caused the injury. Instead of dismissing the action against both for lack of a preponderance of proof against either, the courts have displayed some eagerness to find concert of action, and so permit recovery against both.[51]

51. Oliver v. Miles, 1927, 144 Miss. 852, 110 So. 666; Benson v. Ross, 1906, 143 Mich. 452, 106 N.W. 1120; Kuhn v. Bader, 1951, 89 Ohio App. 203, 101 N. E.2d 322; cf. Regina v. Salmon, 1880, 6 Q.B.D. 79; State v. Newberg, 1929, 129 Or. 564, 278 P. 568.

In this situation the California supreme court has solved the problem by placing the burden of proof on the issue of causation upon the two defendants.[52] There is support for

52. Summers v. Tice, 1948, 33 Cal.2d 80, 199 P.2d 1, 5 A.L.R.2d 91. The court merely extended the rule as to the burden of proof on the issue of apportionment of damages. See infra, p. 254.

this in two Canadian decisions,[53] and

53. Cook v. Lewis, [1952] 1 Dom.L.Rep. 1, [1951] S.C.Rep. 830 (similar facts) ; Saint-Pierre v. McCarthy, [1957] Quebec Rep. 421 (merchants selling cartridges to boys).

in American automobile cases of "chain collisions," in which the plaintiff is injured by one of two or more negligently driven cars, but cannot prove which.[54] It seems a very desira-

54. Murphy v. Taxicabs of Louisville, Inc., Ky.1959, 330 S.W.2d 395; Cummings v. Kendall, 1940, 41 Cal.App.2d 549, 107 P.2d 282; Eramdjian v. Interstate Bakery Corp., 1957, 153 Cal.App. 2d 590, 315 P.2d 19; Copley v. Putter, 1949, 93 Cal.App.2d 453, 207 P.2d 876. Cf. Micelli v. Hirsch, Ohio App.1948, 83 N.E.2d 240 (result accomplished by presumption of continuing life). See also, as to apportionment of damages, infra, p. 255.

ble solution where negligence on the part of both defendants is clear, and it is only the issue of causation which is in doubt, so that the choice must be made between letting the loss due to failure of proof fall upon the innocent plaintiff or the culpable defendants. But where there is no evidence even as to where culpability lies, the hardship may be equally great upon an innocent defendant; and except in very special cases the courts have refused to shift the burden of proof.

Prosser, Law of Torts, § 41, p. 247 (3d ed. 1964). In *Moore* and *Oliver*, only two actors were involved as potential sources of harm and the appellate court accepted as established facts that both fired negligently, that both shot in the

direction of the victim, and that injury was caused by a missile originating from one weapon or the other. In the instant case there are many actors potentially the source of harm. There was evidence of sufficient weight to go to a jury tending to show that some defendants firing (at least 31) did not do so negligently and that harm may have resulted from sources other than those acting tortiously. We are pointed to nothing in Mississippi law indicating that in such a multiple actor situation the courts of that state would hold that as a matter of law actual causation was established with respect to tortious defendants, or to state it differently, that liability attaches to tortious defendants without regard to proof of actual cause of injury.[19] Nor are we cited to any jurisdiction with a rule applicable to like situations that would entitle plaintiffs to directed verdicts with respect to causation. We turn then to the Restatement, which speaks in terms of a shift of burden to the defendants.

(1) Except as stated in Subsections (2) and (3), the burden of proof that the tortious conduct of the defendant has caused the harm to the plaintiff is upon the plaintiff.

\* \* \* \* \* \*

(3) Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm.

19. The general rule in Mississippi appears to be that of Blizzard v. Fitzsimmons, 193 Miss. 484, 10 So.2d 343 (1942), holding that no recovery can be had where there is no showing which of several possible causes produced the injury where some of the causes do not involve the negligence of the party charged. The Mississippi courts have distinguished *Blizzard* in some specialized situations. See, e. g., Hinds-Rankin Metropolitan Water & S. Assn. v. Reid, 256 So.2d 373 at 379 (Miss.1971) :

"In the *Blizzard* case the evidence failed to show which of the several possible causes

produced the injury. Here, the evidence is overwhelming that the contents of the sewerage lagoons was not a mere possible cause of plaintiffs' injury, but was probably the only substantial source of contamination that caused the damage to the minnows and the land. We are, therefore, of the opinion that the *Blizzard* case is not applicable to the facts of this case."

The acts of any of the instant defendants negligent as a matter of law are no more than "mere possible cause(s)" and are far from "the only substantial source of [injury]."

Restatement, Second, § 433B. This section leaves upon the plaintiff the burden of proving the existence of the threshold factors that quicken subsection (3). Comments g and f provide:

> g. The rule stated in Subsection (3) applies only where it is proved that each of two or more actors has acted tortiously, and that the harm has resulted from the conduct of some one of them. On these issues the plaintiff has still the burden of proof.

> * * * * * *

> f. Subsection (3) states a further exception [arising] . . . where the conduct of two or more actors has been proved to be negligent or otherwise tortious, and it is also proved that the harm to the plaintiff has been caused by the conduct of only one of them, but there is uncertainty as to which one.

> * * * * * *

See also Illustrations 9. and 11. *Id.* at p. 447. Taking the view most favorable to the plaintiffs, the evidence at least required that both of the two threshold issues referred to in comment *g.* be submitted to the jury. With respect to the question of who acted tortiously, there was evidence under which a jury could find that the fire of at least 31 MHP defendants was non-tortious. With respect to source of harm, the fire which injured the plaintiffs could at least as readily have come from members of the group of 31 as from one or more of the group of seven.[20] Given the numerical disparity between the two groups, the hundreds of missiles that the jury could find validly fired, and the lack of identification of any direction of fire from a particular defendant or defendants in the group of seven and toward a particular victim or victims, the jury was entitled to find that the threshold requirements were not met, that the burden of proving

cause remained on the plaintiffs and that this burden was not satisfied.[21]

The plaintiffs also assert that all defendants are liable on a theory of joint enterprise, citing *Oliver* and *Moore*. This contention, if accepted, would avoid plaintiffs' problems regarding causation, since there is no substantial evidence that injury to the plaintiff victims came from any source other than the gunfire of the detachment. The two Mississippi cases are, however, exceptions to usual rules of proof of causation where defendants are acting tortiously, and they do not impose vicarious liability upon non-tortious actors. Nor are the actions of a law enforcement detachment, each member of which has individualized authority to act against sniper fire, consistent with the concepts of joint enterprise liability. The joint enterprise theory of liability arises by analogy to the law of partnership, usually by a contract express or implied and under circumstances in which each participant has an equal voice in conducting the enterprise, and in most instances has been restricted to automobile cases as a defensive doctrine by which the negligence of a driver is imputed to a passenger. Prosser, Law of Torts § 71, pp. 488–90 (3d ed. 1964). In this instance the detachment was under overall supervision and command of supervisors, and the officers in the ranks had been granted individual authority to act against sniper fire. In any event, whether a joint enterprise exists is a question for the jury. *Id.* at 488.

## F. LIABILITY OF INDIVIDUALS ON OTHER GROUNDS.

All supervisory officers on the scene are claimed to have failed to perform various command functions: Lt. Magee (in charge of the detachment), failure to inform all officers to load and

---

20. In fact, on a purely statistical basis, more readily.

21. An additional complicating factor is that of the group of seven defendants, five fired shotguns and two fired solid shot. Three of those whose claims are in suit were struck by shotgun pellets, but there is no evidence of what type of shot struck Kenter and Weakley.

fire only upon command, failure to be familiar with MHP procedures on crowd control; Inspector Lloyd Jones (in charge of the MHP officers), going to the aid of Patrolman Turcotte when he should have been ordering cease fire; Chief Inspector Armistead and Assistant Inspectors Vinson and Cooper (subordinates but with command functions over at least some MHP officers), failure to keep others from firing and encouraging others to fire by joining in the firing themselves. All of these alleged failures raised jury questions and could not be the basis for directed verdicts.[22]

It is clear from the volume and scope of the fire, the comparable training and procedures of other law enforcement agencies, and the testimony of the experts and of the MHP officers, that the MHP was deficient in establishing and implementing standards for conduct of large detachments in situations of riot and/or sniper fire. There were no plain distinctions between small-group and large-detachment procedures. Yet the National Guard limited individual responsive fire to soldiers on patrol. There was no clear principle that in the large detachment situation the individualized right of the officer to fire at will gave way to a right to fire only upon command, or if it continued was subject to some kind of ceiling that would prevent the cumulated individual discretionary fire of members of the detachment from escalating into a barrage (which every expert testified was both inappropriate and valueless.) Normally there is a large detachment rule that all or most men take cover rather than fire while proper anti-sniper procedures are carried out. Numerous MHP officers testified that they had no duty to take cover. The most vivid demonstration of the shortfall in MHP training was the testimony of the officers themselves. There

were critical contradictions and ambiguities in the non-supervisory officers' respective understandings of what was proper for them to do in the situation. Reading their testimony, one can understand how on the night of May 15 there ensued a confused mass reaction during which, as the supervisory officers acknowledged, they lost control of the men under their supervision.

 Commissioner Crisler was stipulated to be the person responsible for regulations and training of the MHP. He was not, however, subject to absolute liability if its procedures or training proved to be deficient but only for due care in the performance of his duties. This was a jury issue, properly submitted to that body and decided by it. Expert witness Pomeroy testified that the dangers of response by massive firepower had been learned in Watts in 1965 and Detroit in 1967. In a different context, the Supreme Court has spoken of the fact that the training, policies and procedures of law enforcement agencies relating to handling mass and mob actions are an evolving area of knowledge in which comparative judgments necessarily must be made and a wide range of dissimilar procedures may exist. Gilligan v. Morgan, 413 U.S. 1, 8, 93 S.Ct. 2440, 2444, 37 L.Ed.2d 407, 414 (1973). We cannot say that a senior police officer who, the evidence shows, has fallen short in developing procedures in this evolving and diffuse area of knowledge and in training the officers for whom he is responsible, is liable as a matter of law.[23]

For like reasons we reject the claim that there was liability as a matter of law against individual officer defendants who had prepared lesson plans for MHP training, submitted the plans to officials of MHP for approval, and then conducted training pursuant thereto.

---

22. Possible liability of Armistead, Cooper and Vinson based on their participation in the firing was considered under section E.

23. In this connection, Commissioner Crisler explained that the primary mission of the

MHP is traffic safety, that it carries out the additional duty of riot control only upon proclamation by the governor, and when called out for such duty its task is not to assume primary control but to assist local law enforcement officers.

## G. JURY CHARGES—AND SOME LOOSE ENDS.

 The court did not err in charging over objection that plaintiffs must prove by a preponderance of the evidence that some or all of defendants fired their weapons wrongfully or negligently. Appellants urge that the burden was not upon plaintiffs because, in firearms cases, Mississippi imposes liability upon the defendant who has discharged a firearm and injured another unless he proves he is wholly free from fault. They rely upon the last sentence of the statement in Johnston v. Cunningham, *supra,* quoted earlier at the beginning of Section D. That sentence reads as follows:

> We take the following rule from Barrows on Negligence, p. 367: "The bearer of loaded firearms is bound to exercise the utmost diligence in their handling, and he is liable for any injury caused by their discharge, unless it appear that he was entirely without fault."

65 So. at 118. The statement sets forth, and twice restates, the high degree of care that Mississippi requires in the handling of firearms. We do not construe the last sentence to be a holding that in firearms cases there is placed on the defendant a burden of proving freedom from fault and imposing liability upon him unless he disproves any and all fault. Possibly the last sentence merely emphasizes that once a departure from the rigid standard of care is proved, even if the departure is slight, the defendant will be liable. Or—and we think this more likely—it may refer to the fact that the person who has discharged a firearm under circumstances that otherwise would breach the standard of care has the opportunity to prove that he is "without fault" in the sense that he was privileged to fire, rendering non-tortious conduct that otherwise would be tortious. In the traditional calculus of tort law fault is an element and plaintiff must prove it. The above-quoted statement does not impose liability without fault but rather retains fault as an element. The Mississippi Supreme Court would hardly effect, in a single ambiguous sentence at the tail end of a textual quotation, a change in a concept as fundamental as the obligation to prove fault.

## H. CONCLUSION.

We summarize the key points controlling ultimate disposition of this case. There was evidence on which the jury could find there was sniper fire and plaintiffs so concede. Under the governing Mississippi law of privilege, and with respect to most of the officers who fired, there was sufficient evidence to submit to the jury as to whether the respective officers were privileged to fire in self defense or to suppress a riot, and, if privileged, whether nevertheless they employed excessive deadly force or fired without due regard to the safety of others. With respect to a few officers, the evidence established that they were guilty of tortious conduct as a matter of law, but the question of whether any one or more of them was an actual cause of harm to any plaintiff was for the jury. Liability of supervisory and command officers was a jury issue. The State of Mississippi and the City of Jackson were immune from suit. There was no error in the jury charges.

Our conclusions make it unnecessary for us to discuss questions concerning assumption of risk, alleged immunity of individual officers from suit, and alleged liability of Crisler on respondeat superior grounds for tortious acts of individual officers.

This case was correctly submitted to the jury for decision. The jury has spoken, and the judgment entered on its verdict must be and is affirmed.