Ronnie Gene **COGHLAN** by reason of the wrongful death of his father, Clarence Eugene Coghlan, decedent, Plaintiff,

v.

Maurice **PHILLIPS**, Sheriff of Sharkey County, Mississippi, A. B. Derrick, Chief Deputy Sheriff, Sharkey County, Mississippi, Charles Ray McPhail, Police Officer, City of Rolling Fork, Sharkey County, Mississippi, and Lindsey Adams, Police Officer, City of Rolling Fork, Sharkey County, Mississippi, Defendants.

Civ. A. No. W75–78(N).

United States District Court,
S. D. Mississippi, W. D.

March 11, 1977.

David Seth Michaels, Atty., Mississippi Mental Health Project, Jackson, Miss., Mark Shefield, Atty., American Civil Liberties Union of Mississippi, Jackson, Miss., for plaintiff.

Carl F. André, Jr., Perry, Phillips, Crockett, Morrison & Herring, Jackson, Miss., E. C. Clements, Clements & Clements, Rolling Fork, Miss., for defendants.

## MEMORANDUM OPINION

NIXON, District Judge.

This civil suit seeking recovery of damages for the death of the plaintiff's father, Clarence Eugene "Gene" Coghlan, was filed pursuant to 28 U.S.C. §§ 1331 and 1343(3) and (4). Plaintiff's federal cause of action is based on 42 U.S.C. § 1983, the Civil Rights Act of 1871, as well as the denial of the deceased's rights guaranteed by the 8th (cruel and unusual treatment) and 14th (deprivation of life without due process of law) Amendments to the United States Constitution. Additionally, plaintiff invokes this Court's pendent jurisdiction of his damage claim brought pursuant to the Mississippi Wrongful Death Act, Miss.Code Ann. § 11–7–13 (1972), and the Mississippi Common Law. This Court has jurisdiction of the state claim because it and the federal claim arose from the same nucleus of operative facts. *Burton v. Waller,* 502 F.2d 1261, 1265 (5th Cir. 1974), *cert. denied,* 420 U.S. 964, 95 S.Ct. 1356, 43 L.Ed.2d 442 (1975); *Anderson v. Nosser,* 438 F.2d 183, 188–189 (5th Cir. 1971), *mod. on rehearing on other grounds,* 456 F.2d 835 (5th Cir.) (en banc), *cert. denied,* 409 U.S. 848, 93 S.Ct. 53, 34 L.Ed.2d 89 (1972).

The defendants herein are Maurice Phillips, the Sheriff of Sharkey County, Mississippi; A. B. Derrick, Chief Deputy Sheriff; Charles Ray McPhail and Lindsey Adams, both members of the Rolling Fork, Mississippi Police Department who were at the time in question acting as deputy sheriffs pursuant to the request of Derrick, both of these police officers having previously been deputized by the Sheriff's Department.

The decedent, Gene Coghlan, died as a result of being shot by either the defendant McPhail or the defendant Adams in the front yard of his residence in rural Sharkey County, Mississippi on February 24, 1975 under the following circumstances.

Pursuant to stipulation of counsel it was established that plaintiff's decedent was a divorced white male citizen of Sharkey County, residing at the home of his mother, Mrs. E. F. Coghlan, at Spanish Fort, Star Route, Holly Bluff, Sharkey County and was unemployed. He had attended school through the eighth grade and had received a sentence of dishonorable discharge and five years imprisonment by a General Court Martial which found him guilty of assault with intent to commit murder. Additionally, he was convicted in both 1956 and 1958 (apparently in Sharkey County) of assault to commit murder; had been a patient at Mississippi State Mental Hospital at Whitfield in 1962; was convicted of attempted rape in Sharkey County in 1963 after pleading guilty and was sentenced and placed on five years probation; in 1964 his probation was revoked after he was convicted again of attempted rape, resulting in his serving a five-year sentence in the Mississippi State Penitentiary. On February 25, 1975, the date of his demise, the decedent was the parent of one child, the plaintiff herein, a married adult who received no financial support from his father.

On February 24, 1975, the decedent's mother, Mrs. B. F. Coghlan, accompanied by her daughter, the deceased's sister, Mrs. Louise Templeton, drove to Rolling Fork, the County Seat of Sharkey County, where they met with the defendant, Sheriff Maurice Phillips, requesting his assistance in view of the fact that the decedent had displayed fits of anger during which he had at various times discharged firearms both inside and outside the house of Mrs. Cogh-

lan, with whom he resided. In addition, he had threatened various members of the family and others, had refused to let anyone in the house at various times and had even intimated that he would do harm to his mother by "doing something" to her pickup truck. They also related to the Sheriff that the decedent had sat on the front porch the previous day firing rifles across the road and when reminded that a doctor had previously advised that he not be permitted to have firearms, threw all of his weapons into the yard and subsequently asked his son, the plaintiff herein, to take them and keep them at his house. Although the plaintiff knew that his father had kept one pistol at that time, Mrs. Templeton was unaware of that fact and Mrs. Coghlan's knowledge thereof is not disclosed by the record, but neither told Sheriff Phillips that the defendant had retained the pistol.

Mrs. Coghlan executed a formal statutory application to have the decedent adjudged a lunatic, alleging that he was "suffering from a mental or nervous condition, affliction or disorder to such an extent that [he was] in need of treatment, supervision or control and to an extent that [he was] likely to become dangerous or a menace if left at large." This application asked that Coghlan be "adjudged to be suffering from a mental or nervous condition, affliction or disorder and be committed to and confined in the proper mental institution for treatment, care and supervision as authorized by [state law]." (Ex. P–3). This application was filed with the Chancery Clerk of Sharkey County, Mississippi as required by Mis-

sissippi law, and Mrs. Coghlan took with her an application form for admission of the decedent to the Mississippi State Hospital, which was given to her by Sheriff Phillips, who told her that she could fill it out subsequently and deliver it to the officers who came to execute the lunacy writ which would issue pursuant to the filing of the above application. This she did and subsequently filled it out and returned it to the Sheriff's office on the next morning, February 25. In this application she related that the decedent had "been tested at Whitfield" and that he had "uncontrollable fits of anger. Recently, threatened to kill anyone entering house and fired several shots which could have killed someone. In fits of violence destroys whatever is in his way. Has voiced threats to burn down house—insinuated that he would tamper with mother's pick-up truck so that she might be harmed." (Ex. P–4).

After receiving the application from Mrs. Coghlan on the morning of February 25, Sheriff Phillips, prior to leaving for Jackson, Mississippi to keep a previous appointment with a polygraph operator, instructed Deputy Sheriff W. D. King to execute the lunacy writ which was issued by the Chancery Clerk of Sharkey County pursuant to Miss.Code Ann. § 41–21–7 (1972).[1]

This writ, issued by the Chancery Clerk, acting as a quasi-judicial officer pursuant to State Statute, commanded the Sheriff "to take into custody [the decedent] forthwith and place him so that he may be examined by two reputable physicians duly appointed by the [Chancery Clerk]." (Ex. P–6).

---

1. § 41–21–7. Person to be taken into custody; appointment of two examining physicians.

Whenever such affidavit as is provided for in section 41–21–5 shall be filed with the chancery clerk, the said clerk, or chancellor of said court, shall issue a writ directed to the sheriff of the proper county to take the person alleged to be suffering from such mental or nervous condition, affliction or disorder into his custody for examination as set forth in section 41–21–9. Said clerk or chancellor shall forthwith appoint and summons two reputable, licensed physicians to conduct an inquiry into the mental and nervous condition of such person in the presence of the

clerk and to report their verdict and findings to said clerk of the court. In all counties wherein there is a county health officer, such county health officer, if available, may be one of the physicians so appointed. Neither of the physicians selected shall be related to such person in any way, nor shall such physicians have any direct or indirect interest in the estate of such person. The physicians so appointed shall be selected as having the best available qualifications in the field of mental medicine.

Superceded effective July 1, 1975, by Miss. Code Ann. § 41–21–67 (Supp.1976).

In the interim, on the afternoon of February 24, 1975, Mrs. Coghlan had informed the decedent that she had filed the aforesaid application with the Chancery Clerk and he had become enraged.

Pursuant to the instructions of the Sheriff, Deputy W. D. King, accompanied by Deputy Fred King, arrived at the decedent's home at approximately 10:15 A.M. on February 25. W. D. King knocked on the front door and in response to the decedent's question told him that they "needed to see him and to come to the door", which he refused to do. The deputy then told him that he had papers for him, in response to which Coghlan told them to leave because he was not coming out. Freddie King remained on the front porch of the Coghlan house while W. D. went to the patrol car to radio the Sheriff's office to ask for instructions and was told by the desk clerk deputy and radio operator that they should stand by while she called the County Attorney for instructions. While awaiting a response from the radio operator, Freddie King returned to the patrol car and told W.D. that the decedent had threatened to shoot him if he did not immediately remove himself from the front porch. Gene Coghlan then shouted that if the deputies did not get out of his yard he would shoot them, and he immediately fired between four and ten shots at them with a .38 calibre pistol. Although neither of the deputies was injured by the shots, the windows in the patrol car were broken and one of the deputies' clothing was torn by a bullet. While being fired upon, they called the Sheriff's office on the radio and informed the operator that they were under fire and needed immediate assistance. They then immediately drove their patrol car out of the decedent's yard to the end of a dead end road, awaiting further instructions or assistance.

Subsequent to the deputies King driving away from the decedent's house and prior to the time that assistance did arrive, the decedent walked over to his son's (the plaintiff's) house where he demanded that the plaintiff's wife, his daughter-in-law, Mrs. Ronnie (Linda) Coghlan, give him the guns which he had previously thrown in the yard and asked his son to take home. She immediately complied with this demand, because she had previously been told by her husband to return the guns to his father without question upon request and because she was very apprehensive and feared the decedent. These guns consisted of two automatic 12 ga. shotguns, one 30.06 and one 22 mag. rifle, and numerous ammunition. The decedent then loaded these guns in Linda Coghlan's house and asked for the 30.06 clip. When she went back to the bedroom to search for the clip, which she subsequently delivered to Coghlan, she quickly telephoned her husband to tell him what had transpired, including the fact that she had previously heard the sound of shots (which had been fired by Coghlan at the deputies King). The plaintiff immediately left work and proceeded as fast as possible to his home, arriving some fifteen to thirty minutes later.

In the meantime, prior to Ronnie Coghlan's arrival, and pursuant to the call for assistance by the deputies King, the defendant, Chief Deputy A. B. Derrick, enlisted the assistance of the defendants McPhail and Adams, members of the Rolling Fork Police Department who had previously been deputized as special deputies, and one Billy Johnson, a city employee who was Superintendent of Sanitation and Streets and who was at that time specially deputized by Derrick. The four of them proceeded toward the Coghlan residence after Derrick had told them that the deputies King were pinned down and under fire by the decedent and needed help. None of the three were told that the Kings had been attempting to serve a lunacy writ on Coghlan. Billy Johnson had secured a tear gas gun and projectiles from the Rolling Fork City Clerk and armed himself with a pistol. The defendant McPhail had armed himself with a .308 rifle and carried his .357 Magnum pistol which he normally kept on his person, and the defendant Adams had armed himself with a .303 calibre rifle in addition to his .357 Magnum.

Before the officers arrived at the Coghlan residence, Mrs. Linda Coghlan had arm-

ed herself with a .22 calibre rifle which she loaded and stood by the window watching the decedent walking up and down in his front yard, since she was very fearful of him. She had also called the Sheriff's office after refusing to let her brother come get her because she was fearful of what Coghlan might do to him, and had requested that someone come get her and her baby. However, by radio Derrick informed the radio operator at the Sheriff's office to warn the deputies King to stay away, because Linda Coghlan's trailer was only approximately 200 yards from the decedent's house.

When Derrick, McPhail, Adams and Johnson arrived at the scene, plaintiff, Ronnie Coghlan, because of fear of his father, refused to comply with Derrick's request to go to the house and attempt to talk his father into coming out and giving up.

Derrick utilized a loudspeaker or bullhorn five or six times to ask the decedent to come out of the house, telling him that they wanted to talk with him and wished to take him to a doctor, all to no avail. Derrick then instructed Johnson, Phillips and Adams to approach Coghlan's house under cover down the river bank and attempt to get close enough to permit Johnson to fire a tear gas shell into the dwelling. Derrick last used the bullhorn or loudspeaker asking Coghlan to come out of the house approximately fifteen minutes after the other three had begun their 200 yard journey toward the decedent's house. As the three closely approached the house, Coghlan emerged carrying two rifles. Derrick shouted to him to ask him to come to the road and throw his guns down, that they wanted to talk to him. In response, the decedent fired the two rifles in the direction of Adams, Johnson and McPhail, who were 75 yards away from him and who immediately took cover, with the exception of McPhail who was without cover but who immediately threw himself on the ground. Adams thought at that time that McPhail had been hit, but learned differently shortly thereafter. The decedent then fired at the officers again, and Adams heard the sound of a bullet pass directly over his head. Ad-

ams and McPhail then returned the fire, missing Coghlan, who then fired at them again. They again returned his fire with their rifles, one of them mortally wounding him, although it was never determined which of the two officers' shots struck the decedent, who died later in the Rolling Forks Hospital, where he was taken by ambulance which had been immediately summoned by Chief Deputy Derrick.

Pursuant to the standard operating procedure, evidence was gathered at the scene, and although all of the empty cartridges were not picked up off the ground in the area where Coghlan was shot and went down, an empty 30.06 cartridge, as well as several 22 Magnum hulls were retrieved. In addition, the following weapons and ammunition were recovered from the person of and the house of the decedent: One .22 calibre Magnum Winchester rifle; one 30.06 Remington Woodmaster rifle; one .38 Special calibre Colt pistol; one Model 755 A Savage 12-gauge automatic shotgun as well as another 12-gauge automatic shotgun; ammunition consisting of one full box and two partially empty boxes of Super-X Magnum .22 calibre cartridges, as well as three loose ones; two .38 Special calibre lead nose cartridges and ten .38 calibre copper jacket cartridges; several 12-gauge shotgun shells including two No. 6 shots, three No. 2 buckshots, three No. 4 shots, and eleven 00 buckshots; one clip of 30.06 ammunition containing two copper jacket lead nose round cartridges, one copper jacket steel nose pointed cartridge and one copper jacket lead nose pointed cartridge; and the above mentioned expended Super X Magnum .22 calibre shell and expended 30.06 calibre Springfield shell.

The plaintiff bottoms his claim for damages against the defendants and each of them on the following grounds: that McPhail and Adams used excessive force toward the decedent and failed to properly attempt to serve the lunacy writ upon him or take him into custody, particularly in view of the fact that they knew or should have known that he suffered from a nervous or mental disorder and was armed and

dangerous; that Sheriff Phillips and Chief Deputy Derrick failed to discharge their duty to properly supervise Adams and McPhail in the discharge of their duties, and more particularly in the execution of the lunacy writs or the arrest of persons known to suffer from a mental or nervous disorder; failed to properly devise procedures and methods of executing lunacy writs; failed to discharge their duty to properly train their deputies in arrest procedures under the facts and circumstances that existed herein; and failed to hire fit and proper persons equipped to handle firearms and promulgate regulations and/or written procedures for the execution of lunacy writs and/or firing at those whom they were attempting to apprehend; that Phillips, Derrick, McPhail and Adams in their respective capacities failed to discharge their common law and statutory duties to keep the peace, to protect innocent citizens from harm, and to handle firearms in a careful and responsible manner.

The defendants contend that the death of Clarence Eugene Coghlan was a justifiable homicide under the provisions of Miss.Code Ann. § 97–3–15 (1972);[2] that Adams' and McPhail's acts of firing were not unreasonable under the circumstances, or if otherwise unreasonable, were justified under the privilege of self defense; that the defendants enjoyed an absolute immunity by virtue of the fact that they were attempting to execute a lunacy writ issued by the Chancery Clerk of Sharkey County as authorized by Mississippi law and thus enjoyed the same judicial immunity as would a Chancery Judge or Chancery Clerk in connection therewith; or, in the alternative, that they enjoyed a qualified immunity by virtue of their performing the duties of police officers in a reasonable manner exercising sound discretion under the circumstances then and there existing without us-

ing excessive or unreasonable force at the time and place of the shooting, but merely returned the fire of Coghlan who had fired at them on several occasions and had them pinned down approximately 75 yards away. In addition to relying on the foregoing defenses, the defendants Phillips, who admittedly was not present and took no active part in any of the happenings at Coghlan's residence on February 25, and Derrick deny liability because of lack of supervision of Adams and McPhail, because there was no written policy procedure promulgated by the Sheriff's office for the service of a lunacy writ or the apprehension of one who was resisting the service thereof or because of failure to properly train or instruct their subordinates in connection with the proper and accepted use of firearms.

Under the facts of the present case, any liability of the defendants under § 1983 can be no broader than their liability under Mississippi law. While an improper motive or purpose on the part of the defendants is not an element for a cause of action under § 1983, *Whirl v. Kern,* 407 F.2d 781 (5th Cir.), *cert. denied,* 396 U.S. 901, 90 S.Ct. 210, 24 L.Ed.2d 177 (1969), the purpose with which an unconstitutional act is done is highly relevant to recovery under § 1983, but relevant more as a source of defenses springing out of the common law of torts than as an obstacle to the statement of a § 1983 cause of action. The Mississippi statutory defense of justifiable homicide, as well as the Mississippi common law defense of self defense, may be asserted in response to and defense of a § 1983 cause of action to the same extent that they are relevant to the pendent Mississippi law claim. *Burton v. Waller, supra* at 1274.

It is well established that Mississippi imposes the highest degree of care upon a

2. The killing of a human being by the act, procurement, or omission of another shall be justifiable in the following cases:

 \* \* \* \* \* \*

(f) When committed in the lawful defense of one's own person or any other human being, where there shall be reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished;

(g) When necessarily committed in attempting by lawful ways and means to apprehend any person for any felony committed; . . .

person handling firearms. *Roberts v. Williams*, 302 F.Supp. 972, 986 (N.D.Miss.1969), aff'd, 456 F.2d 819 (5th Cir.), *cert. denied*, 404 U.S. 866, 92 S.Ct. 83, 30 L.Ed.2d 110, *mod.*, 456 F.2d 834 (5th Cir. 1972).

■ As stated, the defendants assert the common law privilege of self defense as well as the statutory privilege of justifiable homicide set forth in Miss.Code Ann. § 97–3–15 (1972). Under Mississippi law retreat is not a prerequisite to the use of deadly force. *Burton v. Waller, supra* at 1275; *McCall v. State,* 29 So. 1003 (Miss.1901); *Conner v. State,* 13 So. 934 (Miss.1893). Officers McPhail and Adams testified that they feared death or serious bodily harm from the fire directed at them by Coghlan, who had ignored all pleas to lay his guns down and come out of the house and give himself up under promise that he would not be harmed, and that the officers wanted to talk with him and take him to a doctor. This Court, as the trier of fact, finds that McPhail and Adams were acting within the scope of the privilege of self defense which privilege of course inures to the benefit of the defendants, Derrick and Phillips, with reference to the plaintiff's vicarious liability claim against them.

■ The next question to be decided is the allowable scope of permitted deadly force and the manner of its employment under the circumstances of this case. It is well established that the privilege to use deadly force is not unrestrained, but rather subject to limitations of scope and manner exercised, and when self defense is claimed, the actor is not privileged to use any means which is intended or likely to cause bodily harm in excess of that which he correctly or reasonably believes to be necessary for his protection. *Burton v. Waller, supra* at 1276; Restatement (Second) of Torts § 70(1) (1965). Derrick, McPhail and Adams believed that the means which they applied were necessary to prevent the apprehended harm and not merely that they were likely to be effective in preventing it; furthermore, we find that their belief was reasonable, that is, the circumstances which were known or should be known to them were such that a reasonable man would so believe. Also, we find that under the exigency in which they were placed by the decedent's conduct and the necessity for a rapid decision as to the means which they would use in their own defense, they acted reasonably, confronted with the necessity of defending themselves against a real attack. Thus, the force used by them was not excessive but was such as to amount to self defense within the meaning of the law. *Burton v. Waller, supra* at 1277.

■ This Court also concludes that the actions of the defendants, that is, their killing of the decedent was justifiable under the provisions of Miss.Code Ann. § 97–3–15 (1972), because it was done in the lawful defense of their own person and each other, inasmuch as there were reasonable grounds to apprehend design on the part of Coghlan to do them great injury and there was eminent danger of that design being accomplished by virtue of the fact that Coghlan suddenly emerged from the house carrying two rifles which he began firing at the officers from a distance of approximately 75 yards away. Furthermore, this Court finds that the shooting of the decedent under the circumstances was necessary in order to preserve the peace, as well as committed in attempting by lawful ways and means of apprehending the decedent for the commission of a felony, namely, pointing, aiming and discharging firearms at them while resisting arrest as well as having shot at the deputies King. Miss.Code Ann. §§ 97–3–7, –11 (1972).

Initially, the deputies King were attempting to execute the lunacy warrant as commanded by the Chancery Clerk of Sharkey County by taking the decedent into custody forthwith and delivering him for examination by two reputable physicians to be duly appointed by the Clerk of Court as provided by Mississippi law. When Coghlan fired upon them while they were seated in their police car, breaking the windows of the car and tearing the clothes of Deputy W. D. King, he committed a felony by violating the provisions of the foregoing statute, particularly that proscribing the pointing, aim-

ing and firing of deadly weapons and assault with intent to kill. The defendants, Derrick, Adams and McPhail, together with Special Deputy Johnson were not only attempting to execute the lunacy warrant but were attempting to apprehend an armed felon whose propensity for violence was well established and who had not only ignored but define the police officers' repeated efforts to avoid confrontation and to peacefully resolve the matter by repeatedly calling for him to surrender and talk to the officers and giving him every opportunity to do so. Actually, they were not advancing on the decedent's house where he was holed up with his arsenal of weapons and ammunition for the purpose of shooting or injuring him, but merely for the purpose of firing the tear gas gun into the house to force him to come out and surrender and thus remove the great danger not only to himself but to the public at large, including his mother, whom he had threatened to kill, as well as other members of the general public. It was quite evident that Coghlan's entire family feared him, and his own son had refused Derrick's request to go talk to his father in an attempt to persuade him to peacefully resolve the serious matter which existed.

Although this Court is of the opinion that the foregoing legal defenses of self defense and justifiable homicide absolve the defendants McPhail and Adams and probably Derrick, of any civil liability to the plaintiff, nevertheless there remains the question concerning whether the defendants, Sheriff Phillips and/or Chief Deputy Derrick, are liable for failure to promulgate specific procedures or regulations, to properly instruct their personnel in the execution of lunacy writs, or to hire fit personnel sufficiently trained in the use of deadly weapons or firearms.

First, the plaintiff failed to prove by a preponderance of the evidence that any of the defendants were not sufficiently or properly trained in the use of firearms, or more specifically in the employment thereof pursuant to the execution of their official duties. Actually, the only evidence in this regard is the testimony of the defendants, McPhail, Adams and Derrick. Of course, McPhail and Adams were members of the Rolling Fork Police Department, and there was an agreement between the Sharkey County Sheriff's Department and the Rolling Fork Police Department that each would assist the other when called upon in case of emergency at the time that this unfortunate incident took place. McPhail and Adams had been previously deputized by the Sheriff of Sharkey County.

McPhail had been on the Rolling Fork Police Department for approximately two years and had been a member of the Vicksburg, Mississippi Police Department from 1966 to 1968, having received two weeks basic training at the Highway Patrol Law Enforcement Academy in Jackson, Mississippi, and had been a member of the Mississippi National Guard. He had received training in the use of weapons and special training in criminal investigation and narcotics in the two weeks special class at the academy in Jackson.

Officer Adams had been given a five week training course at the Law Enforcement Academy in Jackson, Mississippi prior to going to work for the Rolling Fork Police Department in 1970.

Although Chief Deputy Sheriff Derrick had received no formal law enforcement training, he had served as a fulltime Deputy Sheriff for almost eight years and as a part-time deputy sheriff prior to that time, performing the usual customary duties of a deputy sheriff and had been chief deputy since 1971.

Neither Adams nor McPhail had received any specialized training or instruction in serving lunacy writs or arresting one who was mentally disturbed, and the Rolling Fork Police Department had no standardized written procedures or regulations concerning the service of lunacy writs, since this was not one of their usual and customary duties or functions. However, on the occasion in question, when they went to assist in the apprehension of Coghlan, they were not informed nor did they know that Coghlan was the subject of a lunacy pro-

ceeding, but were merely conscripted to and were assisting in the apprehension of an armed person who had fired upon fellow officers and was considered dangerous. They were actually assisting not in attempting to serve the lunacy writ but in the apprehension of Coghlan under the foregoing circumstances.

The defendant, Chief Deputy Derrick, had served approximately twelve lunacy writs prior to February 24, 1975 and on several occasions had encountered difficulty in complying with the command of the writ to take the subject into custody forthwith and deliver him for examination by two doctors. With assistance he had been able to do so prior to this time although none of the subjects had ever been armed with or utilized firearms, but some had resisted on several occasions, requiring the use of a straight jacket on one occasion where he had been informed that the subject was mentally retarded. Although there was no written regulation or procedure concerning the service of lunacy writs or the apprehension of those the subject thereof, the sheriff had orally instructed all members of his department that they were to use the minimum force required to execute the writ and were to avoid injuring the subject thereof, if possible.

Neither the Sharkey County Sheriff's Department nor the Rolling Fork Police Department had any written or oral procedures or instructions concerning when they could fire their weapons except for the fact that they were orally told that they could fire in necessary self defense without command from a superior officer on the scene, and that the firing of their weapon in self defense was a discretionary matter with each, to be exercised under existent facts and circumstances.

 This Court finds that although there were some deficiencies in the failure to promulgate procedures and regulations governing the use of weapons by officers in self defense, that is, when and under what circumstances they could fire their weapons, as well as the procedures to be followed in executing a lunacy writ by the Sheriff's

Department, nevertheless these did not amount to negligence, and certainly, if mistaken in this finding and conclusion, this Court finds that any such negligence was not the proximate cause or contributing cause of the decedent being shot and killed under the facts and circumstances of this case. *See Burton v. Waller, supra* at 1285.

 In view of this Court's foregoing findings and conclusions, it is not necessary to discuss the question of absolute or qualified immunity raised in defense to this action; suffice it to say that although there is serious question concerning whether the officers were absolutely immune from suit in view of the fact that they were attempting to execute a judicial or at least quasi-judicial writ commanding them to take the decedent into custody, and were doing so in a manner which did not exhibit the use of excessive force under the facts and circumstances existing, this Court is of the opinion that the doctrine of qualified immunity spoken to by Chief Justice Burger for the Supreme Court in *Scheuer v. Rhodes*, 416 U.S. 232, 244–248, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) would absolve all the defendants herein of civil liability to the plaintiff. As the Chief Justice stated:

> In common with police officers, however, officials with a broad range of duties and authority must often act swiftly and firmly at the risk that action deferred will be futile or constitute virtual abdication of office. . . . When a condition of civil disorder in fact exists, there is obvious need for prompt action, and decisions must be made in reliance on factual information supplied by others.

416 U.S. at 246, 94 S.Ct. at 1691. The Court further stated:

> These considerations suggest that, in varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for

the belief formed at the time and in the light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct.

416 U.S. at 247–248, 94 S.Ct. at 1692.

We find that under all the facts and circumstances of this case, the defendants' conduct was immune under the protective doctrine of qualified immunity.

In conclusion, this Court finds and concludes that officers McPhail and Adams were privileged to fire in self defense and also were justified in doing so under the statutory law of the State of Mississippi, and in doing so that they did not employ excessive deadly force but only that which was reasonably necessary and required under the circumstances; that neither Sheriff Phillips nor Chief Deputy Sheriff Derrick were vicariously liable because of the foregoing complete defenses. Likewise, neither was negligent with respect to the hiring of personnel or failure to properly supervise or instruct their personnel with reference to the use of firearms or their execution of lunacy writs, and if mistaken in this belief, we further find that their negligence, if any, did not proximately cause the decedent's death. Furthermore, the defendants were qualifiedly immune from liability for the act of shooting the decedent under the facts and circumstances that existed herein and as fully discussed above.

Accordingly, a Judgment conforming with the foregoing findings of fact and conclusions of law contained in this Memorandum Opinion shall be prepared by the defendants' attorneys, agreed as to form, and submitted to this Court within the time prescribed.